# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

------------------------------------- x

PERSONAL COMMUNICATIONS DEVICES, LLC, :
:
                       Plaintiff,       :    Index No. 30060/12
:
            -against-        :
: **SECOND AMENDED**
PHILIP CHRISTOPHER AND KOSTAS   : **COMPLAINT**
KASTAMONITIS,              :
             Defendants.    :
:
:
:
:
:

------------------------------------- x

      Plaintiff Personal Communications Devices, LLC ("PCD") by its undersigned attorneys, for its Second Amended Complaint against defendants Philip Christopher and Kostas Kastamonitis (the "Defendants") alleges as follows:[1]

## INTRODUCTION

      1.    PCD is and has been a major Suffolk County employer, with nearly 200 employees and $2.8 billion in sales in 2011. It has been in existence, in one form or another, since the 1970s.

      2.    PCD's founder and former Board member and Chief Executive Officer ("CEO"), Defendant Philip Christopher, has been engaged in a self-professed campaign to "tear down" PCD, in violation of the law and the terms of his lucrative employment contract with PCD. This

---

[1] In its initial Complaint, PCD also brought suit against Reliance Communications, LLC ("Reliance"), AirTyme Communications, LLC ("AirTyme"), Louis Antoniou, Stacy Klug, Bonnie Rabinowitz, Eileen McGilly and Cornelius VanGinhoven. However, PCD has since settled this case with those parties.

campaign began when Christopher learned that he was to be removed as CEO by PCD's Board of Directors.

3. Thus, he surreptitiously launched an attack on PCD while still the CEO of PCD and a member of its Board of Directors—*becoming CEO of a competitive venture while still employed by PCD and a member of its Board.* His plan was audacious—while still CEO of the Company and a Board member he joined a new competitor, launched a plan to steal PCD's key employees, steal its customer and vendor relationships, spread lies in order to tarnish its reputation and undermine its key business relationships, and create a carbon copy of the Company, under his control. Due to his willingness to disregard the law and his fiduciary duties and betray PCD's trust, his plan in many respects succeeded and he is now liable for the millions in damages he caused PCD.

4. Christopher attacked PCD under cover of retaining his position as CEO and a trusted Board member, which allowed him to betray that trust and engineer his attack in secret, without giving PCD the chance to respond. PCD did not know what Christopher was doing until after he had *already secretly become CEO of a competitor,* arranged for that competitor to be capitalized and facilities to be set up, and recruited dozens of PCD employees, including senior officers and other key individuals. The damage Christopher and Kastamonitis did to PCD is a direct result of their violation of their duties by launching their campaign in secret, while still PCD employees/officers. If Christopher and Kastamonitis had followed the law and fulfilled their duties to PCD, they would not have been able to launch their campaign in secret and spend valuable time building a competitive enterprise while still working at PCD. Instead, they would have had to wait until after Christopher, Kastamonitis and countless others left the Company. As a result, they would not have had access to PCD employees and proprietary information and

would have had to conduct their efforts from scratch and in the daylight—allowing PCD to respond in real time and compete fairly.

5.    Without this illegally-gained competitive advantage they would have been unable to do the millions of dollars in damage done to PCD by their scheme, in the form of, *inter alia*, lost business, damaged relationships with key suppliers, damaged professional reputation, distraction of management and the Board in fighting off the illegal attack, hiring temporary employees and engineering staff, and professional fees.

6.    Though Christopher did not  separate from PCD until September 4, 2012, long before that he had secretly accepted a position with a competitor (former Defendant AirTyme, an affiliate of former Defendant Reliance, both of which are controlled by Parveen ("Mike") Narula), and begun to work toward PCD's destruction, using his position as CEO and a member of the Board of Directors to collect sensitive information and, with the assistance of men like Kastamonitis, recruit employees for AirTyme from within, all while pretending to negotiate with the Board to remain with PCD.

7.    The position he took at AirTyme was that of CEO, so that from no later than August through the early part of September Christopher was the CEO of both PCD *and* its new direct competitor, AirTyme. As CEO of AirTyme he controlled its operations and actively directed its activities and the activities of its employees, many of whom Christopher recruited secretly from PCD.

8.    In June 2012, Mr. Christopher learned that PCD's board was considering removing him as PCD's CEO, due to his poor performance. That decision was formally announced on August 16, 2012.

9.      Between no later than the first week of August (and possibly earlier) and September 4, 2012, while still CEO, Christopher negotiated with the Board to retain the title of Chairman and continue with the Company in some capacity, even though he had already decided to leave PCD, had accepted employment with a competitor, and begun taking steps to destroy PCD and build his new venture.

10.     Christopher had no intention of staying with the PCD. As noted above, well before PCD's formal decision to remove him as CEO on August 16, Christopher was already working in secret for a new employer.

11.     For example, Reliance, the parent of his new employer AirTyme, applied for a corporate American Express card for Christopher in early August. Indeed, the CEO of Reliance told his contact at American Express via email *on August 6th* that he needed that corporate card for Christopher "yesterday." He took this step presumably in order to allow Christopher to begin the work of "tearing down" PCD as quickly as possible without leaving a paper trail detectible by PCD.

12.     Though Christopher was secretly an employee of competitive enterprise AirTyme by no later than the first week in August, in furtherance of his scheme to destroy PCD he spent the next month feigning negotiations with the Board of PCD, in order to maintain access to PCD employees and proprietary PCD information.

13.     For just one example, in August 2012, after secretly joining AirTyme but  while still PCD's CEO and a member of its Board, Christopher met at PCD's offices with Cornelius VanGinhoven, then a PCD officer, and recruited him to join AirTyme. He told VanGinhoven that virtually "everyone" had already agreed to abandon PCD and join Christopher in his new enterprise. He then requested that VanGinhoven provide him with a confidential list of his PCD

department's employees and their salaries (a confidential PCD document). After obtaining that document, Christopher told VanGinhoven those people could all come to the new enterprise. He then asked VanGinhoven to recruit them. This all happened at PCD's offices while Christopher was CEO of the company he was trying to destroy and VanGinhoven was a senior executive.

14.     VanGinhoven was not the first PCD employee Christopher recruited to AirTyme. Earlier than that, and again, while Christopher was PCD's CEO, he and Reliance's CEO, Mike Narula, invited PCD officer and Board member Louis Antoniou to Christopher's country club to persuade him to take employment with AirTyme and assist with Christopher's attack on PCD. Among other things, Christopher and Narula told Antoniou that if he joined AirTyme, they would pay him an immediate signing bonus of more than $850,000 and guarantee the value of his equity holdings in PCD, which Antoniou then valued at more than $1 million.

15.     During that meeting, Antoniou warned Christopher that if he went forward with his plan, he and his cohort would be sued by PCD. Christopher and Narula informed Antoniou that they would indemnify him in the event of that anticipated lawsuit, and would pay for his attorneys' fees. Christopher knew that what he was doing was wrong, illegal and would result in expensive and distracting litigation for PCD. Yet he took steps leading inexorably to expensive and distracting litigation, *while PCD's CEO*.

16.     Also during that meeting, Antoniou inquired as to how AirTyme would be able to compete with an established business like PCD, given how capital intensive the business was. In Christopher's presence, Narula informed him that $150 million in capital was backing the enterprise, which would allow him and Christopher to compete with PCD. During this discussion, which occurred in August 2012, Christopher was PCD's CEO.

17. Antoniou accepted this offer of employment and received payment of more than $850,000. *On information and belief, this payment was made by AirTyme, at Christopher's direction, while Christopher was still CEO of PCD.* In other words--while CEO of PCD-- Christopher paid another senior PCD officer and Board member almost $1 million in cash to violate his duty of loyalty to PCD and help him destroy PCD. Christopher also expressly placed Antoniou in charge of aspects of Christopher's recruiting efforts at PCD. For example, when VanGinhoven asked Christopher for a specific list of PCD employees who had already committed to AirTyme in response to Christopher's attempt to recruit him while still CEO (described above), Christopher told VanGinhoven to meet with Antoniou. At Christopher's direction, Antoniou and VanGinhoven met, at PCD's offices, and Antoniou reassured VanGinhoven that numerous key employees already had been recruited.

18. On September 4, 2012, Christopher formally announced that "negotiations" had broken down and he would not continue with PCD. However, Christopher directed several of the employees he had successfully recruited to AirTyme, including certain officers that were named as defendants in PCD's original complaint, to remain at PCD while they continued, in violation of the law, to secretly recruit their colleagues and subordinates while misappropriating PCD's confidential information and disrupting key business relationships.

19. When these employees finally left PCD to physically join Christopher at AirTyme, Christopher caused these AirTyme employees to utilize the confidential information they learned while employed by PCD (including but not limited to account passwords) to try to access PCD's equipment and databases by falsely claiming to still be employed by PCD, in an attempt to misappropriate those resources for AirTyme, disrupt PCD's business and give AirTyme an unfair competitive advantage.

20.     Christopher and Kastamonitis also utilized PCD's confidential information in crafting dozens of employment offers AirTyme presented to then-current PCD employees.

21.     After joining AirTyme, Christopher spread false rumors concerning PCD, which were designed to create confusion in the market about PCD's viability and corporate status and which were designed to make PCD's suppliers and customers hesitant to continue doing business with PCD. Among other things, Christopher and the former-Defendants falsely informed certain of PCD's business counter-parties that AirTyme has acquired PCD and is in possession of its inventory, over which PCD no longer has control.

22.     Similarly, and in violation of the law and his lucrative employment contract, which contains a perpetual non-disparagement clause, Christopher lied to PCD's customers and suppliers, including its biggest customer, Verizon Wireless ("Verizon"), and its biggest suppliers, High Tech Computer Corp. ("HTC") and Hitachi High Technologies America, Inc. ("Hitachi"), falsely claiming that as a result of employee defections at PCD (which Mr. Christopher himself illegally conspired to cause while still PCD's CEO) PCD would not be able to meet its obligations under its contracts.

23.     On information and belief, Christopher also coordinated with Reliance, with which PCD had previously enjoyed a lucrative business relationship, to stop paying PCD for phones PCD sold to Reliance prior to Christopher's departure. At the time of Christopher's departure from PCD, Reliance owed (or would soon owe) PCD approximately $30,000,000. On information and belief, Christopher coordinated with Reliance not to pay PCD this $30,000,000 in order to allow Christopher to create a liquidity crisis for PCD that would hinder PCD's ability to compete against AirTyme and also force PCD into a fabricated breach of its contract with its most significant supplier, Hitachi (PCD's June 23, 2006 Master Service Agreement with Hitachi

is hereafter referred to as the "Hitachi Contract").

24.     At the same time, Christopher and Kastamonitis interfered with the Hitachi Contract by causing Hitachi to breach the Hitachi Contract by prematurely demanding payment from PCD for certain phones Hitachi had sold PCD under a Purchase Order executed pursuant to the Hitachi Contract. When PCD refused to prematurely pay Hitachi—in part because of the liquidity crisis that Christopher had created with Reliance—Hitachi declared the Hitachi Contract cancelled and refused to continue performing thereunder. This not only cut off PCD's supply of Hitachi-sourced cell phones, and of the corresponding revenue, but as discussed below, directly interfered with PCD's business relationship with Verizon because PCD's performance under its contract with Verizon depended on Hitachi performing under the Hitachi Contract by supplying PCD with, among other things, spare parts with which PCD was obligated to fix phones PCD previously sold to Verizon.

25.     Finally, in order to conceal these actions from PCD, Christopher and the former-Defendants engaged in the systematic concealment of evidence, including emails, reflecting their misconduct. When one of the former-Defendants slipped up and sent an email regarding their scheme over PCD's network, he was immediately instructed to "delete everything." Although Christopher and the former-Defendants went to great lengths to keep their activities hidden and undiscoverable, the limited evidence available presents a picture of a highly organized and multifaceted scheme, engineered and directed by Christopher to, as Christopher said, "tear down" PCD. In fact, this evidence was only obtained by PCD because Kastamonitis was using his PCD-issued cell phone to conduct the business of recruitment on behalf of AirTyme.

## PARTIES

26.     Plaintiff Personal Communications Devices, LLC, is a Delaware limited liability company, and has its principal place of business at 80 Arkay Dr., Hauppauge, NY 11788.

27.     Defendant Philip Christopher is an individual residing at 108 Fairway View Drive, Commack, New York 11725.

28.     Defendant Kostas Kastamonitis is an individual residing at 443 Echo Avenue, Sound Beach, NY 11789.

## JURISDICTION AND VENUE

29.     At all times relevant to this action, the Defendants have transacted and continue to transact business in the State of New York.

30.     The employment agreement between PCD and Mr. Christopher was entered into in New York, and by its terms is governed by the law of New York.

31.     The majority of the Defendants' tortious conduct alleged in this Second Amended Complaint took place in New York.

32.     Plaintiff and Defendants either reside or have their principal places of business in New York.

33.     Venue for this action is proper in Suffolk County pursuant to CPLR § 503(c) as PCD maintains its principal places of business therein.

## FACTUAL ALLEGATIONS

### The Parties

34.     PCD is in the business of buying cellular phones from manufacturers and conforming and customizing those phones for sale by their carrier clients to the carrier's ultimate

customers. PCD's largest suppliers of cell phones are HTC and Hitachi and its largest customer is Verizon.

35. PCD has been in business, in one form or another, since the 1970s.

36. PCD has nearly200 employees and in 2011 had sales of approximately $2.8 billion.

37. Christopher had been the CEO of PCD, or its predecessor entities, since the 1970s. Sometime in June 2012 Christopher learned that PCD's Board was considering removing him as CEO. This decision was formally announced by the PCD board on or about August 16, 2012.

38. AirTyme (which is no longer a defendant) was in the business of "reverse logistics," historically focusing on the repair and the sale of refurbished or surplus cellular equipment. Until Christopher's departure from PCD, AirTyme did not compete with PCD. However, Christopher, beginning while he was still employed by PCD as its CEO and a Board member of PCD, built a new division at AirTyme, which was intended to compete directly with PCD's core business.

39. Reliance (which is no longer a defendant) has historically been a customer of PCD and also has not competed with PCD. Reliance is owned by the same family which owns AirTyme, and participated in Christopher's scheme, as alleged herein, including in connection with the recruiting of PCD employees to AirTyme.

40. Kostas Kastamonitis is a former PCD employee, who left PCD to take employment at AirTyme. While at PCD, Kastamonitis was Vice President of Product Development & Engineering. Kastamonitis remained a PCD employee until September 12, 2012. Kastamonitis is currently employed by Hitachi.

41.     Louis Antoniou (who is no longer a defendant) is a former PCD employee, who left PCD to take employment at AirTyme. While at PCD Antoniou was Vice President of International Sales and Member of the Board of Directors. Antoniou remained a PCD employee until September 19, 2012.

42.     Cornelius VanGinhoven (who is no longer a defendant) is a former PCD employee, who left PCD to take employment at AirTyme. While at PCD, Mr. VanGinhoven was Vice President of Engineering. VanGinhoven remained a PCD employee until September 19, 2012.

43.     Stacy Klug (who is no longer a defendant) is a former PCD employee, who left PCD to take employment at AirTyme. While at PCD, Klug was Director of International Operations. Klug remained a PCD employee until September 19, 2012.

44.     Eileen McGilly (who is no longer a defendant) is a former PCD employee, who left PCD to take employment at AirTyme. While at PCD, McGilly was a Senior Marketing Manager. McGilly remained a PCD employee until September 20, 2012.

45.     Bonnie Rabinowitz (who is no longer a defendant) is a former PCD employee, who left PCD to take employment at AirTyme. While at PCD, Rabinowitz was a Senior Administrative Assistant. Rabinowitz remained a PCD employee until September 14, 2012.

*Christopher Begins Building AirTyme and Recruiting PCD Employees While Still its CEO*

46.     Before PCD even formally announced that it was replacing Christopher as its CEO, Christopher had taken employment with AirTyme. For example, on August 6, 2012, Narula sent an email to American Express demanding a Reliance credit card for Christopher "yesterday". Christopher, as well as his secretary at PCD, Barbara Pepitone, were also provided in August with an AirTyme email address and phone number, so Christopher could begin

-11-

conducting business on AirTyme's behalf, including the destruction of PCD, while still its CEO and a Board member.

47.     At the same time, Christopher surreptitiously worked to secure commitments from top PCD employees to leave with him upon his departure from PCD. Among those that Christopher approached directly were three of PCD's high-level employees: Louis Antoniou, Kostas Kastamonitis and Cornelius VanGinhoven.

48.     As discussed above, Christopher began recruiting these executives while Christopher was a Board member and the CEO of PCD.

### *Defendants' Pre-Orchestrated Scheme is Revealed*

49.     The day after Christopher resigned, September 5, 2012, Kastamonitis, Antoniou and VanGinhoven, resigned their jobs at PCD. And although they immediately became employees of AirTyme, Kastamonitis, Antoniou, and VanGinhoven remained at PCD for two additional weeks, during which time they continued to recruit PCD employees on behalf of AirTyme and Christopher.

50.     On that same day, indeed, by 10:40 a.m., Christopher revealed himself as an employee of AirTyme, though he had in fact been an employee since no later than the first week of August. By the late morning of his first day after "resigning" from PCD, Christopher, who had obtained an Reliance credit card and AirTyme email address and phone number long before leaving PCD, was actively recruiting additional PCD employees, PCD suppliers and PCD customers (offering one supplier a $20 million all-cash deal).

51.     Christopher's $20 million offer concerned a new Pantech device which had not yet been revealed to the market. Christopher learned of the device as PCD's CEO because PCD performed work on the device for Pantech and Verizon. Before noon on his first official day

-12-

working for a competitor (which he had actually joined no later than August), Christopher was trading on confidential PCD information.

52.     On the following two days, September 6 and September 7, 2012, an additional 42 PCD employees quit their jobs at PCD and took immediate and waiting employment at AirTyme. Many of these resignations were, in the words of VanGinhoven, "orchestrated" by VanGinhoven prior to Christopher's and VanGinhoven's departure from the Company and pursuant to Mr. Christopher's instructions, which he gave while still PCD's CEO.

*Additional Breaches of the Duty of Loyalty*

53.     At the same time that Mr. Christopher was officially leaving PCD for AirTyme (after accepting employment at AirTyme/Reliance long before), many more PCD employees, including Kastamonitis, Antoniou, VanGinhoven, Klug, Rabinowitz and McGilly, whom Mr. Christopher had also already hired for AirTyme, stayed behind at PCD to secretly continue AirTyme's recruiting efforts.

54.     On September 6, 2012, Christopher directed McGilly (who was at the time still employed by PCD) to contact two of her subordinates at PCD, Adrian O'Hare and Jamie Rabino, and offer them employment at AirTyme. At the time, Christopher knew McGilly was still employed by PCD.

55.     At Christopher's direction, McGilly contacted Adrian O'Hare, in an effort to recruit her to work at AirTyme. McGilly told O'Hare that she could offer her a job at AirTyme because Christopher "wanted [O'Hare's] group to work at his new company". Interested, O'Hare attended a reception where in the presence of many other then-current PCD employees, Christopher gave a speech extolling the virtues of working at AirTyme over PCD.

56. Pursuant to Christopher's direction, McGilly also contacted Jamie Rabino and offered her a position with AirTyme, which Ms. Rabino accepted.

57. On September 6, 2012, while still an employee of PCD, Kastamonitis contacted his subordinate, Sanjeev Sam (a talented engineer), and offered him a $20,000 signing bonus and a 20% raise if he came to work at AirTyme.

58. On September 7, 2012, while still an employee at PCD, Klug contacted her subordinate, Carly Sneider, with an offer of employment from AirTyme.

59. At all times these then-PCD employees were acting on instructions from Christopher either given directly or through others, including Antoniou.

60. As a result of the Defendants' manipulations, by Friday, September 7, 2012, just three days after Mr. Christopher resigned from PCD, fourteen of eighteen PCD engineers had taken employment at AirTyme. In all, within seventeen days of Mr. Christopher's departure, seventy-four employees resigned from PCD to take employment with AirTyme. Their departures were orchestrated by Christopher, Kastamonitis and others while Christopher and Kastamonitis owed duties of loyalty to PCD.

*The Defendants Make Improper Use of PCD's Confidential Information*

61. One reason that Christopher was so successful in pillaging PCD's employees from PCD was that he had obtained from, at a minimum, VanGinhoven, lists of the salaries of the employees he wanted to take from PCD.

62. Kastamonitis then fed that information to Reliance, which was negotiating the employment agreements on behalf of AirTyme, to help them craft recruitment offers for PCD employees that were more competitive than what PCD was offering.

-14-

63.     Christopher, through AirTyme, which he controlled as its CEO, also attempted (and in some cases succeeded) to take from PCD equipment necessary for PCD to service its biggest customer, Verizon, and put that equipment into use at AirTyme.

64.     For example, on or about September 8, Kastamonitis directed Rabinowitz, his subordinate at PCD, to give Verizon "permission" to transfer his Verizon test line from PCD to AirTyme. Test lines are important tools used to service PCD's customers by allowing PCD to test equipment on their carrier customers' networks.

65.     Kastamonitis not only succeeded in transferring his test line, but used it at AirTyme until he learned that PCD discovered it had been stolen.

66.     Moreover, on September 18, 2012, VanGinhoven, also Rabinowitz's superior at PCD, on behalf of AirTyme, which was controlled by Christopher, directed Rabinowitz to move all of PCD's Verizon test lines to AirTyme. To do so, Rabinowitz, contacted Verizon and lied to Verizon, telling it that PCD had been acquired by AirTyme. Rabinowitz then wrongly instructed Verizon to transfer from PCD to AirTyme control of thirty-six phone lines being used by PCD to conduct critical lab testing necessary for PCD to perform under its contract with Verizon. However, due to the odd nature of this request, Verizon sought additional confirmation from PCD, which stopped this mass transfer.

67.     VanGinhoven and Kastamonitis were acting on Christopher's directions when they instructed Rabinowitz to transfer the Verizon test lines to AirTyme.

68.     Additionally, as discussed above, on September 5, 2012, immediately after leaving PCD, Christopher attempted to steal business from PCD by making a substantial business offer to Pantech concerning a new Pantech cellular phone which has not yet been

revealed to the market. Christopher only knew of the existence of this device because he was formerly PCD's CEO and PCD had performed work on the device for Pantech and Verizon.

69. Finally, immediately after Christopher and the former-Defendants left PCD, PCD discovered that additional information had been taken from PCD and in some cases, PCD's copies of such information had been destroyed or damaged so that it could no longer be used by PCD. This included PCD's "F-Drive", which contained product software and schematics for phones PCD bought from its suppliers to sell to the wireless carriers. This information was extremely valuable to Christopher and AirTyme as it would have allowed Christopher and AirTyme to immediately compete with PCD without having to obtain this information from PCD's suppliers and carriers. Moreover, by interfering with PCD's access to such information, AirTyme was able to hinder PCD's ability to service its customers, creating the appearance that PCD was not a viable business entity.

70. At all times during their employment with PCD, Defendants were aware of the duty of loyalty which the Defendants owed PCD. They also were aware that the conduct alleged herein violated that duty.

### *Christopher Disparages & Defames PCD to its Most Important Customers and Suppliers*

71. In addition to the overtly tortious assaults on PCD described above, Christopher engaged in a campaign to destroy PCD's reputation and sow fear with its customers and suppliers that PCD was going out of business, had been acquired by AirTyme and/or would not be able to fulfill its contractual obligations.

72. For example, just one day after Christopher left PCD (indeed, by 10:40 a.m.), he reported that at some time before then he had "explained the whole situation" to Verizon's chairman and was fast at work defaming and disparaging PCD and PineBridge (a majority

shareholder of PCD, whose representatives have a controlling vote on the PCD Board of

Directors) to Pantech:

> My friend, in our cultures, words like honesty, honor, integrity and courage are
> not taken lightly. Pinebridge will learn that they cannot abuse their majority. In
> America, minority (management has rights). I rely on your friendship and as you
> say, "your big brother needs you."

73.    The implication of Christopher's statement is clear: PineBridge and the board of

PCD are dishonest, dishonorable, and lack integrity, and Pantech should not do business with

them. Christopher further defamed PCD and its investors to Pantech on September 5, 2012:

> I did not get a chance to see you prior to your departure from New York last
> month. Yesterday was my last day at PCD and unfortunately, the investors
> (PineBridge) *violated and trampled* the Operating Agreement. They basically
> forced me out of PCD and *now my investment is in serious jeopardy.*

By this email, Christopher falsely informed Pantech that the Company had "violated and

trampled" an agreement and that his "investment is in serious jeopardy," *i.e.*, that the value of his

ownership stake in PCD was jeopardized.

74.    Christopher knew these statements were false when he made them. He made

them for the purpose of harming PCD's relationship with Pantech. His statements did harm that

business relationship. And that relationship was worth millions of dollars to PCD.

75.    On the same day, Christopher repeated these false claims to Hitachi, another PCD

supplier:

> As we discussed, yesterday was my last day at PCD. The investors (Pinebridge)
> violated and trampled on the Operating Agreement and against the wishes of
> management, they appointed a new CEO.

76.    Besides plainly violating his employment contract, this statement shows that

Christopher began to engage Hitachi in discussions disparaging his employer while he was still

employed by PCD ("*As we discussed*, yesterday was my last day . . .").

77. Christopher knew this statement was false when he made it. He made it for the purpose of harming PCD's relationship with Hitachi. His statement did harm that business relationship. And that relationship was worth millions of dollars to PCD.

78. Subsequently, PCD learned from D.J. Kang and Alex Seo of Pantech that Christopher had told them in mid-September 2012 that as a result of the mass departures Christopher orchestrated at PCD, "PCD was not going to be able to perform the job" and that Pantech should be doing business with AirTyme instead of PCD.

79. Christopher knew this statement was false when he made it. He made it for the purpose of harming PCD's relationship with Pantech. His statement did harm that business relationship. And that relationship was worth millions of dollars to PCD.

80. Christopher also defamed and disparaged PCD to key supplier HTC. Following a meeting with HTC, PCD's most important supplier, Martin Fichter, HTC's VP of Products and Operations, sent PCD's new CEO an email explaining that "there is a lot of concern about PCD's ability to continue business with the departure of so many people.... there is a lot of hallway chatter, *and Philip [Christopher] is fanning the flame*."

81. Similarly, Christopher met with key executives at Verizon, including Saeed Saatchi, Evaristo Gonzalez, Jesus Ramos and Mark Krolian and told them that "PCD was no longer going to exist." Christopher made this statement for the purpose of defaming and disparaging PCD and destroying its business relationship with Verizon. He knew this statement was false when he made it.

82. Immediately following Christopher's meetings with Verizon, Verizon contacted PCD and requested – for the first time in the parties' long business relationship – that PCD

establish to Verizon's satisfaction that PCD was a viable entity not in danger of going out of business, which would be able to service Verizon's business.

83.     For another example, on September 13, 2012, Christopher lied to Dan Mead at Verizon, stating falsely via email that AirTyme was assuming all of the supply contracts from PCD's vendors and that the only way to "protect Verizon's current programs" was to expedite a supply agreement with AirTyme. This email was blatantly false and defamatory and had no purpose other than to destroy PCD's reputation and its multi-million dollar relationship with Verizon by persuading Verizon employees of a falsehood: that AirTyme had assumed PCD's supply contracts. Christopher knew that this was false.

84.     However, for PCD's largest customers and suppliers, like Verizon and HTC, the mere prospect of PCD's failure is threatening as it would result in significant economic losses for them as well. Here the threat was even more pronounced because Christopher, as PCD's former CEO, could hold himself out as having special knowledge of PCD's operating condition. As a result, PCD was forced to expend significant resources attempting to mend its relationships with its suppliers and customers and dispelling Christopher's lies.

85.     Despite PCD's efforts, PCD's relationship with Verizon has been irreparably damaged and PCD's relationship with Verizon has been significantly reduced.

86.     Finally, Christopher and those working for him at AirTyme have engaged in a campaign to spread the false rumor in the marketplace that PCD has been purchased by AirTyme and that AirTyme is in control of PCD's inventory of cellular phones. This lie has spread quickly and as a result many long time PCD customers have expressed concerns about working with PCD based on the false premise that PCD does not control its own inventory, when in fact it does.

-19-

87.     In one instance in mid-September, Demi Holding, a third-party distributor of PCD phones, informed Katie Wasserman, VP of Marketing at PCD, that unless PCD provided nearly 300 Electronic Serial Numbers (cellular phone identification numbers) to Demi Holding's customer in order to prove that PCD was still in possession of its inventory, the customer would not purchase the phones. In other words, Defendants have intentionally and falsely disparaged PCD with the purpose of compromising PCD's credibility in the market place.

88.     Besides harming and interfering with its existing business relationships, the intentionally false statements made by Defendants have additionally harmed PCD by distracting PCD's executive team, Board and sales force, diverting thousands of hours of time from the operation of the business to putting out fires started by Christopher, Kastamonitis and their co-conspirators in their attempt to destroy PCD. These false statements continue to tarnish PCD's otherwise excellent reputation in the industry.

### Christopher Tortiously Interferes with the Reliance Contracts

89.     In or about August 2006, PCD began entering into contractual relationships with Reliance in the form of Purchase Orders under which PCD sold Reliance cellular phone at specified prices.

90.     Prior to Christopher's departure from PCD, Reliance had substantially performed under these contracts without incident.

91.     However, following Christopher's departure from PCD, Reliance immediately stopped making payments to PCD for phones it bought and received from PCD under these purchase orders.[2]

---

[2] On October 2, 2012, PCD filed a Motion for Summary Judgment in Lieu of Complaint before the Commercial Division in Suffolk County, New York, seeking relief stemming from Reliance's failure to pay monies owed on invoices up to that date (totaling $15.4 million at that time). On January 25, 2013, PCD and Reliance entered into a confidential settlement of all disputes between the parties, which resulted in a release being executed, pursuant to

92.     At the time that Mr. Christopher left PCD, Reliance owed (or would soon owe) PCD approximately $30,000,000 for phones from PCD.

93.     On information and belief, Reliance stopped making payments to PCD because Mr. Christopher conspired with Reliance, which was at this time his new business partner in AirTyme, to breach its contracts with PCD and withhold payment from PCD of the approximately $30,000,000.

94.     As PCD's former CEO, Christopher was aware that under the terms of PCD's contracts with Reliance, Reliance owed PCD this $30,000,000 and that withholding such payment would constitute a breach by Reliance of its contracts with PCD.

95.     On information and belief, Christopher conspired with Reliance to withhold payment from PCD in order to create a liquidity crisis for PCD, which would not only hamper PCD's ability to compete with Christopher's new company, AirTyme, but also leave PCD unable to pay the money PCD owed Hitachi.

96.     Further, as discussed below, to add pressure on PCD, Christopher simultaneously urged Hitachi to demand immediate payment from PCD before it was due under the Hitachi Contract under threat that if PCD did not make the premature payment, which he knew PCD would be unable to make due to the liquidity crisis he created, thus causing Hitachi to cancel the Hitachi Contract, which it ultimately did.

### *Christopher and Kastamonitis Tortiously Interfere with the Hitachi Contract and the Verizon Business Relationship*

97.     In connection with its business, PCD purchases from Hitachi cellular phones manufactured by Casio Hitachi Mobile Communications Co., Ltd., later NEC Casio Mobile

---

which PCD dismissed its case against Reliance (and AirTyme) and is not naming Reliance (or AirTyme) in this Second Amended Complaint.

Communications, Ltd. ("CHMC"), customizes and conforms them to the specifications established by PCD's wireless carrier clients, including Verizon, and resells those phones to its customers, including Verizon which, in turn, sells the phones to end users. PCD also repairs and services phones that Verizon sells to its end users.

98. In order to secure the technical support, and a supply of CHMC-manufactured phones and spare parts needed to fulfill PCD's obligations to Verizon, PCD and Hitachi (which was distributing CHMC phones) entered into a Master Service Agreement, dated as of June 23, 2006, as amended from time to time thereafter (referred to previously in the Second Amended Complaint as the "Hitachi Contract", which is attached hereto as Exhibit A).

99. These "amendments" acted as Purchase Orders that were entered into between Hitachi and PCD as new models of phones became available.

100. As required by the Agreement, for more than six years, from June 2006 until early September 2012, Hitachi sold CHMC cellular phones and spare parts to PCD, and provided PCD with technical support for those phones. PCD, in turn, resold the phones to Verizon, and serviced and repaired them thereafter using parts supplied to PCD by Hitachi as required by the Hitachi Contract.

101. On November 29, 2011, PCD and Hitachi entered into "Amendment 4 to Agreement" ("Amendment 4"), under which PCD bought certain models of phones for which PCD was required to pay Hitachi on or before September 28, 2012. A true and correct copy of the Amendment 4 is attached hereto as Exhibit B.

102. Despite this, on September 18, 2012, ten days before PCD was obligated to pay Hitachi for the cellular phones purchased under Amendment 4, Hitachi sent PCD an email demanding immediate payment, which Hitachi falsely stated was already due. Hitachi

immediately followed-up with a written letter to PCD repeating this demand and threatening PCD that if it did not pay on or before September 25 (three days before payment was due), Hitachi would immediately cancel its contract with PCD. Hitachi ultimately did cancel that contract.

103.     Hitachi's conduct represented a breach of the Hitachi Contract. On information and belief, this breach was procured by Christopher and Kastamonitis, with the help of Takashiro Hirabayashi, a Hitachi executive, who is a close personal friend of Christopher and Kastamonitis.

104.     On information and belief, Christopher, Kastamonitis and Hirabayashi established the artificial payment deadline of September 25 so that Hitachi could terminate its contract with PCD while both Christopher and PCD's new CEO, George Appling, were travelling through Asia. During their respective Asian trips, Christopher was spreading false rumors about PCD's operational stability, while Appling was meeting with the same counterparties, trying to dispel those rumors.

105.     In fact, on September 25, and in breach of the Hitachi Contract, Hitachi not only immediately cancelled the Hitachi Contract, but sent Verizon a letter informing Verizon that it was switching its business from PCD to AirTyme. At or about the same time, Hitachi and AirTyme entered into a non-binding letter of intent setting forth the basic terms of their new business relationship.

106.     Despite Hitachi's breach of the Hitachi Agreement, PCD made several attempts to reconcile with Hitachi. Among other things, on or about October 9, and several times thereafter, PCD informed Hitachi that it was prepared to make full payment under Amendment 4. PCD tendered this performance and reminded Hitachi that even if PCD had breached the Hitachi Contract (which it had not), time was not of the essence and Hitachi could not justifiably prevent

PCD from performing. Christopher directed his contacts at Hitachi to ignore PCD's tenders of performance, which it did.

107. Simultaneously, PCD demanded from Hitachi that pursuant to Section 8.4 of the Hitachi Agreement, Hitachi continue performing its surviving obligations to provide PCD with the parts and technical support necessary for PCD to perform its obligations under PCD's contract with Verizon, in connection with cellular phones PCD had purchased previously and many of which were not the subject of the ginned up dispute with Hitachi.

108. On information and belief, Hitachi informed Christopher and Kastamonitis of PCD's demands and Christopher and Kastamonitis instructed Hitachi, in breach of the Hitachi Contract, not to comply.

109. On information and belief, as a result of Christopher's and Kastamonitis's interference with the Hitachi Contract, Hitachi refused to supply PCD with spare parts until PCD entered into a new agreement with Hitachi on more favorable terms for Hitachi than it had under the Hitachi Contract, and only after several weeks had gone by during which PCD was prevented from performing under its contract with Verizon.

110. Both Christopher and Kastamonitis were aware of the Hitachi Contract and that the actions it was causing Hitachi to take constituted breaches thereof.

111. On information and belief, Christopher and Kastamonitis caused Hitachi to breach the Hitachi Contract in order to hinder PCD's ability to compete with AirTyme, to shift Hitachi's business from PCD to AirTyme and to disrupt PCD's ability to service PCD's contract with Verizon. All of these goals were accomplished.

112. As result of the breaches described above, PCD was unable to perform fully under its contract with Verizon. Moreover, because now Mr. Christopher had manufactured the

appearance that his lies about PCD's operating condition were true, Verizon demanded written assurances from PCD that despite its dispute with Hitachi, PCD would continue to be able to perform under its contract with Verizon. Because of Hitachi's refusal to perform under the Hitachi Contract, PCD could not provide these assurances causing Verizon to "go direct" to Hitachi, cutting off a significant business source for PCD.

113. Christopher also employed other wrongful means to move Verizon's business away from PCD and to AirTyme. In order to try to create a business relationship between Verizon and AirTyme, and destroy Verizon's relationship with PCD, Christopher, in August, and while still PCD's CEO, surreptitiously treated several Verizon executives to a series of expensive dinners to which he invited his business partner, Naraula, to at least four. Each time, Christopher billed the expense back to PCD so that PCD was effectively paying for his efforts to "tear it down".

114. The Verizon executives treated by Christopher subsequently took steps to shift Verizon business from PCD to AirTyme. After Verizon learned of this conduct, it terminated the individuals who had received Christopher's enticements, and also elected not to do business with AirTyme.

### *Christopher Has Violated his Employment Contract with PCD*

115. On June 30, 2008, PCD and Christopher entered into a valid and binding employment agreement (the "Employment Agreement").

116. Section 6(e) of the Employment Agreement states that:

> The Executive agrees that at any time during his employment with the Company and at any time thereafter, the Executive shall not ... make, or cause or assist any other person to make, any statement or other communication that impugns or attacks, or is otherwise critical to the reputation, business or character of the Company or any of its officers, directors, employees, products or services.

-25-

117. Christopher's obligations, set forth in Section 6(e) continue in perpetuity.

118. Christopher violated Section 6(e) of the Employment Agreement by, among other things, falsely informing PCD's customers that PCD would soon be out of business.

119. Christopher further violated Section 6(e) of the Employment Agreement by, among other things, suggesting to Pantech that PCD, its Board of Directors and/or investors were dishonest, dishonorable and lacked integrity and that they themselves "trampled" Christopher's contract with PCD and had jeopardized the value of PCD.

120. As discussed above, Christopher also breached his employment agreement by falsely informing Verizon and HTC that PCD was going out of business and that PCD would not be able to perform under its contracts with Verizon and HTC.

## COUNT I

### *(Breach of Duty of Loyalty – Philip Christopher)*

121. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs and the paragraphs below with the same force and effect as if hereinafter fully set forth at length.

122. Until September 4, 2012, Christopher was the CEO of PCD.

123. In his capacity as CEO, Christopher owed PCD a duty of loyalty.

124. Christopher breached this duty by, among other things:

- Secretly accepting employment with a competitor and working to destroy PCD while still its CEO and a member of its Board;

- Designing a scheme to "tear down" PCD by creating a new business to compete directly with PCD while still the CEO of PCD;

- Soliciting and arranging for PCD employees to quit working at PCD while still the CEO of PCD; and

- Utilizing PCD's confidential information, including information regarding salaries of PCD employees, to lure away then-current PCD employees to work at his new business with AirTyme and Reliance while CEO of PCD

125. Christopher breached his duty of loyalty willfully, maliciously and for his own

personal benefit.

126. As a direct and proximate result of Christopher's breach, PCD has been damaged

in an amount to be proven at the trial of this action.

## COUNT II

### *(Breach of Duty of Loyalty –Kostas Kastamonitis)*

127. Plaintiff repeats and realleges each and every allegation set forth in the preceding

paragraphs and the paragraphs below with the same force and effect as if hereinafter fully set

forth at length.

128. While still employed at PCD, Kastamonitis knowingly and willfully breached the

duty of loyalty he owed to PCD by:

   a. Soliciting then-current PCD employees to leave PCD to work for a competitor while employed by PCD;

   b. Destroying or attempting to destroy PCD company property, specifically, emails containing evidence of their breaches while employed by PCD;

   c. Utilizing PCD's confidential information for the benefit of AirTyme in order to give AirTyme and unfair competitive advantage against PCD in negotiations with PCD then-current employees while employed by PCD; and

   d. Conspiring to steal and stealing PCD's Verizon test lines for their own benefit and the benefit of Mr. Christopher and the former Defendants while employed by PCD.

129. At all times relevant to the above-referenced allegations, Kastamonitis was

employed by PCD.

130. As a direct and proximate result of Kastamonitis's breaches, PCD has been

damaged in an amount to be proven at the trial of this action.

## COUNT III

### *(Aider and Abettor Liability for Breaches of the Duty of Loyalty – All Defendants)*

131.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs and the paragraphs below with the same force and effect as if hereinafter fully set forth at length.

132.    Christopher and Kastamonitis were at all times aware of the duty of loyalty that PCD's employees owed to PCD.

133.    Christopher and Kastamonitis were at all times aware of the conduct of the former-Defendants that is described in this Second Amended Complaint and caused and/or supported that conduct, including the breaches of the duty of loyalty by the former-Defendants.

134.    Christopher and Kastamonitis provided substantial assistance to the former-Defendants in their breach of their duty of loyalty to PCD by, among other things: (a) identifying which PCD employees AirTyme wanted to hire; (b) providing information concerning each target PCD employee's pay scale; and (c) promoting the former-Defendants' efforts in breach of their duty of loyalty through speeches and other forms of support.

135.    In fact, Christopher was the architect of the entire scheme described in the Second Amended Complaint. As such, he not only provided critical assistance, but the incipient directions that each participant carried out in furtherance of Christopher's plan.

136.    As a direct and proximate result of the Defendants' breaches, PCD has been damaged in an amount to be proven at the trial of this action.

## COUNT IV
### *(Defamation – Philip Christopher)*

137.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs and the paragraphs below with the same force and effect as if hereinafter fully set forth at length.

138.     Christopher made false and slanderous statements to HTC, Hitachi and Verizon, PCD's most important suppliers and customer, respectively, concerning PCD's vitality and ability to meet its contractual obligations. Christopher knew these representations were false, but made them for the purpose of interfering with these critical relationships so that AirTyme might take over PCD's performance under those contracts.

139.     Christopher made false and slanderous statements to Pantech and Hitachi, suppliers to PCD. Christopher told Pantech that PCD and PineBridge are dishonest, dishonorable and lack integrity. Christopher also told Pantech and Hitachi that PCD and its investors breached his agreement with him.

140.     As a direct and proximate result of these defamations, PCD suffered injury in an amount to be proven at the trial of this action.

## COUNT V
### *(Breach of Contract – Philip Christopher)*

141.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs and the paragraphs below with the same force and effect as if hereinafter fully set forth at length.

142.     On June 30, 2008, PCD and Christopher entered into an Employment Agreement.

143.     The Employment Agreement is a valid and binding contract and PCD has fully performed thereunder.

144. Under Section 6(e) of the Employment Agreement, Christopher is prohibited from "mak[ing]....any statement or other communication that impugns or attacks, or is otherwise critical to the reputation, business or character of the Company or any of its officers, directors, employees, products or services."

145. Christopher's obligations, as set forth in Section 6(e) continue in perpetuity.

146. Christopher violated Section 6(e) of the Employment Agreement by, among other things, falsely informing PCD's customers and suppliers that PCD would soon be out of business and could not perform its obligations.

147. Christopher further breached his obligations under Section 6(e) by defaming PCD to Pantech and Hitachi, suppliers of PCD.

148. As a direct and proximate result of Christopher's breach, PCD suffered and continues to suffer loss and damages in an amount to be proven at the trial of this action.

## COUNT VI

### *(Tortious Interference with Prospective Business Advantage – All Defendants)*

149. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs and the paragraphs below with the same force and effect as if hereinafter fully set forth at length.

150. PCD has business relationships with, among others, Pantech, Hitachi, Verizon, and HTC.

151. Mr. Christopher tortiously interfered with and damaged those relationships by, among other things, conspiring with Kastamonitis, Rabinowitz, and VanGinhoven to steal and attempt to steal PCD's property, as described herein.

-30-

152. Christopher tortiously interfered with and damaged those relationships by, among other things, defaming PCD to its customers and suppliers as described herein, including by spreading rumors in the market that PCD has been acquired by AirTyme.

153. Further, Christopher tortiously interfered with PCD's relationship with Verizon by interfering with PCD's supply of Hitachi-sourced phones, repair parts and service assistance. As a result of this conduct, PCD's business relationship has suffered significantly, and continues to suffer.

154. Christopher also tortiously interfered with PCD's relationship with Verizon by influencing Verizon executives with free meals and other dispensations while still acting as PCD's CEO.

155. At all times Christopher and Kastamonitis knew of PCD's relationships with these entities.

156. Christopher acted together with Kastamonitis and the former-Defendants, agreed and conspired to interfere with PCD's business relationships and committed overt acts in furtherance of their plan by, among other things, defaming PCD and attempting to steal its equipment and employees as described in the paragraphs above.

## COUNT VII
### *(Conversion – All Defendants)*

157. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs and the paragraphs below with the same force and effect as if hereinafter fully set forth at length.

158. Defendants conspired, attempted and did convert, for their own benefit and the benefit of each other Defendant, property belonging to PCD.

159.  Defendants did so with the intent to deprive PCD of this property and to enrich themselves and each other Defendant as a result of the same.

160.  Defendants committed overt acts in furtherance of their plan by, among other things, exercising dominion or control over Verizon phone lines belonging to PCD as well as schematics and other materials stored on PCD's F-Drive.

161.  At all times Defendants were aware that these things belonged to PCD and that they had no right to make use of or exercise dominion or control over the Verizon phone lines, outside of their duties as employees of PCD.

162.  As a result of Defendants' actions, PCD has been deprived access to its property and suffered damages in an amount to be proven at trial as a result of the same.

## COUNT VIII

### *(Tortious Interference with Contract – All Defendants)*

163.  Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs and the paragraphs below with the same force and effect as if hereinafter fully set forth at length.

164.  At all times Mr. Christopher and Mr. Kastamonitis were aware of the existence of the Hitachi Contract, which was valid and enforceable.

165.  Nevertheless, Mr. Christopher and Mr. Kastamonitis tortiously interfered with the Hitachi Contract, causing Hitachi to breach the Hitachi Contract.  Among other things, Mr. Christopher and Mr. Kastamonitis directed Hitachi to demand premature payment from PCD in breach of the Hitachi Contract, refuse PCD's tender of performance under the Hitachi Contact, and refuse to provide PCD with phones, parts and services required under the Hitachi Contract.

166.  Neither Mr. Christopher nor Mr. Kastamonitis have a reasonable justification or excuse for this conduct.

167.     As a result of Defendants' actions, PCD lost its business relationship with Hitachi.

PCD also suffered significant harm to its relationship with Verizon. Finally, as a result of

Defendants' conduct, PCD suffered damages in an amount to be proven at trial.

WHEREFORE, Plaintiff Personal Communications Devices, LLC, by its undersigned

attorneys, Goodwin Procter LLP, for its Second Amended Complaint against the Defendants

Philip Christopher and Kostas Kastamonitis, respectfully requests that the Court grant the

following relief:

1.     Enter judgment in favor of Plaintiff on all counts of this Second Amended Complaint; or

2.     Order that Philip Christopher comply with his employment agreement and permanently cease disparaging PCD to its customers, vendors, suppliers, service providers, partners and others;

3.     Order that Defendants, and their officers, agents, employees, attorneys and those in concert or participation with them, be permanently enjoined from defaming PCD to its customers, vendors, suppliers and partners;

4.     Order that Defendants immediately and permanently cease tortiously interfering with any business relationships PCD has with any supplier, customer or service provider, including but not limited to contacting in any way, or causing anyone to contact in any way, any entity providing services or supplies to PCD under the false and fraudulently auspice of PCD authority;

5.     Order that the Defendants remit to Plaintiff any and all of PCD's property that was wrongly converted by the Defendants;

6.     Order that the Defendants pay damages in an amount to be determined at trial as a result of the conduct described in this Second Amended Complaint;

7.     Award Plaintiff prejudgment interest;

8.     Award Plaintiff its costs, expenses and attorneys' fees; and

9.     Enter such further and additional relief as the Court deems to be appropriate.

Respectfully submitted,

By its attorneys,

GOODWIN PROCTER LLP

Richard M. Strassberg, Esq.
John O. Farley, Esq.
Jordan D. Weiss, Esq.
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 813-8800
Fax: (212) 355-3333

Dated: April 10, 2013
        New York, New York